

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHARLENE BROWN, individually and as Mother of Devonta Davis, a minor, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 07 C 3873<br>)<br>) Judge Ruben Castillo |
| PLAINFIELD COMMUNITY CONSOLIDATED SCHOOL DISTRICT 202, *et al.*, | )<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Charlene Brown ("Plaintiff"), individually and on behalf of her son, Devonta Davis ("Devonta"), filed this action under 42 U.S.C. § 1983 against the Plainfield Community Consolidated School District ("the School District") and various school officials (collectively "Defendants"), alleging that they violated Devonta's rights when they expelled him for inappropriately touching his teacher. Presently before the Court is Defendants' motion for summary judgment. (R. 60.) For the following reasons, the motion is granted.

### RELEVANT FACTS[1]

Plaintiff and her son Devonta are African-American. (R. 67, Pl.'s Resp. to Defs.' Facts ¶ 3.) The School District is a public body organized under the laws of the State of Illinois and is responsible for the operation of Plainfield North High School ("PNHS"). (*Id.* ¶ 4.) Devonta was

---

[1] These facts are derived from the parties' statements of facts and exhibits filed in support thereof pursuant to Local Rule 56.1. Unless otherwise indicated, the facts contained herein are undisputed.

1

a freshman at PNHS during the 2006-2007 school year. (*Id.* ¶ 5.) Ron Kamzar, Michael Kelly, Rod Westfall, Stuart Bledsoe, Roger Bonuchi, Victoria Eggerstedt, and Dave Obrzut are members of the Board of Education of Plainfield Community Consolidated School District 202 ("School Board"). (*Id.* ¶ 6.) John Harper is Superintendent for the School District. (*Id.* ¶ 7.) During the 2006-2007 school year, the School District employed Laura Moye ("Moye") as a computer applications teacher at PNHS. (*Id.* ¶ 8.) Devonta was a student in Moye's class until his expulsion. (*Id.*)

As a result of an incident occurring in Moye's class involving Devonta, the School Board conducted a disciplinary hearing on May 2, 2007. (*Id.* ¶ 9.) The hearing was administered by Mark C. Metzger, a hearing officer appointed by the School District ("the Hearing Officer"). (*Id.* ¶ 11.) Plaintiff and Devonta were present at the hearing and were represented by counsel. (*Id.* ¶ 10.) Plaintiff and Devonta both testified at the hearing, and Plaintiff's counsel called two other witnesses: Mark Hudson ("Hudson"), a dean at PNHS, and Moye. (*Id.*) Moye testified that on April 23, 2007, Devonta walked behind her "with the back of his hand brushing across her bottom." (*Id.* ¶ 14(a).) She further testified that Devonta had done the same thing a week earlier, but that she had "assumed it was a mistake" at the time of the first incident. (*Id.* ¶ 14(b).) Upon questioning by Devonta's counsel, Moye would not admit that it was even possible the second touching incident could have been an accident, or that she was mistaken the incident had occurred. (*Id.* ¶ 14(c).) She testified that she felt she had been "sexually harassed, disrespected and humiliated" by the touching incidents. (*Id.* ¶ 14(e).)

Devonta testified that he "did not recall coming into contact with Ms. Moye" on either occasion. (*Id.* ¶ 15(a).) He further testified that "even if such touching had occurred," he did not

2

intend to cause Moya any harm or discomfort. (*Id.* ¶ 15(b).) Devonta was questioned about a prior disciplinary incident occurring in March 2007, in which he was given a three-day suspension for using inappropriate language with a female classmate. (*Id.*) The prior disciplinary report stated: "Devonta announced to the class, 'Do you want to hear the rumor I heard about Sydnei? I heard Sydnei gives good head.'" (*Id.* ¶ 15(c).) When questioned about this incident during the expulsion hearing, Devonta admitted that he made the statement, but claimed that he was simply trying to "make [Sydnei] aware of what others were saying." (*Id.*) Devonta acknowledged that Sydnei's reaction to his statement was "a negative one," and that she became upset and yelled at him. (*Id.*)

Following the hearing, the Hearing Officer prepared a seven-page report summarizing the evidence. (*Id.* ¶ 11.) The School Board met on May 14, 2007, to consider the Hearing Officer's report and documents submitted during the hearing. (*Id.* ¶ 16.) After considering the evidence, the School Board voted to expel Devonta for the remainder of the 2006-2007 school year and the entirety of the 2007-2008 school year. (*Id.*)

According to School District data, between 2001 and 2007, Devonta's offense was the only sexual harassment violation resulting in an expulsion. (*Id.* ¶ 36.) During this period, 11 other students identified as African-American who committed offenses categorized as "sexual harassment" were not expelled. (*Id.* ¶ 38.) Thirty-two students were punished with an out-of-school suspension for sexual harassment offenses during this period: 16 were white; seven were Hispanic, seven were African-American; and two were of unknown race. (*Id.* ¶ 39.) During the 2006-2007 school year, approximately 8 percent of the School District's student population was African-American and 64 percent was white. (R. 74, Defs.' Resp. to Pl.'s Facts ¶¶ 49, 51.)

3

## PROCEDURAL HISTORY

In July 2007, Plaintiff filed this action in federal court raising four claims: violation of Devonta's procedural and substantive due process rights (Count I); violation of Devonta's equal protection rights (Count II); a claim for "preliminary injunction" seeking to require Defendants to re-enroll Devonta while this case is pending (Count III); and a claim for a "temporary restraining order" seeking the same relief (Count IV). (R. 1, Compl.) Following briefing by the parties, this Court denied Plaintiff's request for preliminary injunctive relief, finding that Plaintiff failed to demonstrate a likelihood of success on the merits of his claims, and that the balance of harms and the public interest weighed against requiring Defendants to re-enroll Devonta during the pendency of this case. *Brown v. Plainfield Comm. Sch. Dist. 202*, 500 F. Supp. 2d 996, 999-1003 (N.D. Ill. 2007).

Plaintiff thereafter filed an Amended Complaint alleging three claims: violations of his procedural and substantive due process rights (Count I); a violation of unspecified "civil rights" (Count II); and a race discrimination claim (Count III). (R. 24, Am. Compl.) The Court granted Defendants' motion to dismiss the due process claims, concluding that these claims failed as a matter of law. *Brown v. Plainfield Comm. Sch. Dist. 202*, 522 F. Supp. 2d 1068 (N.D. Ill. 2007).

On December 30, 2007, Plaintiff filed her Second Amended Complaint ("SAC"), alleging three claims: race discrimination in violation of the Equal Protection Clause (Count I); and two state law claims: that Defendants' decision to expel Devonta constituted an abuse of discretion

(Count II) and was against the manifest weight of the evidence (Count III).[2] (R. 47, SAC.)

Defendants now move for summary judgment on all three claims. (R. 60, Defs.' Mot. for Summ. J.)

## LEGAL STANDARDS

A court may grant summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Summary judgment is the "put up or shut up moment in a lawsuit," when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). In deciding a motion for summary judgment, the Court views the evidence, and "all reasonable and justifiable inferences" arising therefrom, in favor of the non-moving party. *Springer*, 518 F.3d at 484.

## ANALYSIS

### I. Equal Protection

Plaintiff's first claim is that Defendants intentionally discriminated against Devonta based on his race in violation of the Equal Protection Clause. (R. 47, SAC, Count I.) To establish a

---

[2] In addition to filing this case, Plaintiff filed a separate suit in state court seeking administrative review of Devonta's expulsion. Defendants removed the case to federal court, where it was assigned to this Court. *See Brown v. Plainfield Comm. Consol. Sch. Dist. 202*, No. 07-6153 (N.D. Ill. filed October 31, 2007). This Court dismissed the removed state case without prejudice, permitting Plaintiff to file an amended complaint in this case asserting the state causes of action. (*Id.*, R. 6, Minute Entry.)

5

violation of the Equal Protection Clause, the plaintiff must show that he is a member of a protected class; that he is otherwise similarly situated to persons outside the protected class; and that he was treated differently from persons outside the protected class. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). A showing of a discriminatory impact on members of a protected class is not sufficient. *McCleskey v. Kemp*, 481 U.S. 279, 293 (1987); *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Franklin v. City of Evanston*, 384 F.3d 838, 846 (7th Cir. 2004). Instead, the plaintiff must show that the defendant "acted . . . with a nefarious discriminatory purpose" in his case. *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000). "'Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *McCleskey*, 481 U.S. at 298.

### A. Statistical Evidence

Plaintiff offers no direct evidence of racial animus or race discrimination, and instead relies heavily on statistics to establish an equal protection violation. (R. 69, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 7-8.) Plaintiff faces an uphill battle in this regard, because an equal protection claim requires proof of intentional discrimination, not just discriminatory effect. *McCleskey*, 481 U.S. at 293; *Washington*, 426 U.S. at 241. Although the Supreme Court has accepted statistics as proof of intent to discriminate in certain limited circumstances, such as in legislative redistricting or jury venire cases, statistical data will establish intentional discrimination only if it is "exceptionally clear." *McCleskey*, 481 U.S. at 297. Thus, a plaintiff can rarely succeed in proving an equal protection violation based solely on statistical evidence.

*See, e.g., Chavez v. Ill. State Police*, 251 F.3d 612, 647-48 (7th Cir. 2001) (rejecting claim that statistical disparity in traffic stops was enough by itself to establish racial discrimination); *Anderson v. Cornejo*, 355 F.3d 1021, 1025 (7th Cir. 2004) (data showing statistical disparity in searches conducted at airport "do not imply that any of the defendants engaged in discrimination based on race or sex."); *Hodges v. Pub. Bldg. Comm.*, 864 F. Supp. 1493, 1501 (N.D. Ill. 1994) (observing that statistics showing that minorities primarily comprised class of people negatively effected by defendant's actions "are not determinative of discriminatory intent."). "Determining the validity and value of statistical evidence is firmly within the discretion of the district court." *Chavez*, 251 F.3d at 641.

Plaintiff's opposition contains a confusing and convoluted analysis of the School District disciplinary data, but it appears Plaintiff is attempting to show that African-American students were punished more often and more severely than their white counterparts, which in Plaintiff's view demonstrates a "pattern of discrimination."[3] (*See* R. 69, Pl's Resp. to Def.'s Mot. for Summ. J. at 5-8.) It is true that "disciplining blacks more harshly than whites for offenses of similar gravity is evidence of racial discrimination." *Williams v. Wender*, 530 F.3d 584, 588 (7th Cir. 2008). However, the data does not bear out Plaintiff's assertion. The School District's data on expulsions indicates that the percentage of expelled students who were African-American varied significantly between 2000 and 2008, from zero percent in 2001-02, to 35 percent (13 students) in the 2004-05 school year, to 21 percent (three students) in the 2007-08 school year.

---

[3] The Court notes that Plaintiff's counsel organized the opposition brief with an argument section lacking any sub-headings, and has jumbled together the arguments regarding the equal protection claim and the arguments regarding the state law claims. (*See* R. 69, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 1-10.) This has created unnecessary difficulty for the Court in determining whether there are any genuine issues for trial.

(R. 67, Pl.'s Resp. to Defs.' Facts ¶ 41.) During this same period, the percentage of expelled students who were white also varied, from 67 percent (four students) in the 2001-02 and 2002-03 school years, to 21 percent (three students) in 2007-08. (*Id.*) The Court can discern no clear pattern in this data to demonstrate that the School District expelled students because they are African-American.

The data also shows that there were African-American students accused of sexual harassment during this period who were not expelled. Between 2001 and 2007, a total of 61 students committed offenses categorized as sexual harassment. (R. 64-4, Defs.' App., Ex. C at 8; R. 67, Pl.'s Resp. to Defs.' Facts ¶ 39.) Twelve, including Devonta, were African-American. (*Id.*) Nearly half of the 61 students, including four African-Americans, were given a warning, lunch detention, or similar punishment. (*Id.*) A total of 32 students were punished with an out-of-school suspension: 16 were white, seven were African-American, seven were Hispanic, and three others were of unknown race. (*Id.* ¶ 39.) This data fails to support Plaintiff's argument that African-American students were punished more severely than white students for committing the same type of offense.

Moreover, in relying on the School District data, Plaintiff has made no attempt to control for other variables, such as the student's disciplinary record and the details of his or her offense. *See Williams*, 530 F.3d at 588-89. Given the discretionary nature of student disciplinary proceedings, *Wood v. Strickland*, 420 U.S. 308, 326 (1975), it is difficult to make any type of useful comparison among the students and the type of punishment they received based on the bare numbers before the Court. *See McCleskey*, 481 U.S. at 297 (because of discretionary nature of decision to impose the death penalty, study indicating racial disparities in imposition of death

penalty was "clearly insufficient" to support an inference of racial discrimination in plaintiff's case); *Anderson*, 355 F.3d at 1024 (statistical disparities in searches did not imply discrimination because "even disparities that cannot be chalked up to random variance may have causes other than race, sex, or another proscribed ground of decision.").

Although there is evidence that Devonta was the only student expelled for sexual harassment, there is also evidence that he was the only student of any race accused of inappropriately touching his teacher on the buttocks. (R. 67, Pl.'s Resp. to Defs.' Facts ¶ 29, 37-39.) Plaintiff has not provided any statistical comparison of African-American and white students accused of committing similar acts of sexual harassment against a teacher, who also had a prior disciplinary infraction on their record. For these reasons, the statistics do not establish that Defendants intentionally discriminated against Devonta on the basis of his race.

### B.     Other Evidence

Plaintiff also fails to present any anecdotal evidence that Defendants treated Devonta differently than similarly situated students outside his protected class. The only evidence on this point is Plaintiff's speculative testimony during her deposition, based on second- and third-hand information, about other PNHS students who were involved in disciplinary proceedings. (R. 64-3, Defs.' App., Ex. B, Dep. of Charlene Brown at 18-34.) At trial, Plaintiff would only be permitted to testify about matters within her personal knowledge, and the information about the other PNHS students is not likely to satisfy this criteria. *See* Fed. R. Evid. 602. Even putting aside this procedural hurdle, the evidence offered by Plaintiff falls short of establishing that similarly situated students were punished more harshly than Devonta.

For instance, Plaintiff testified that a white female student, Katie Kramer ("Kramer"), received more favorable treatment than Devonta, but her testimony also revealed that Kramer's sexual harassment offense did not involve misconduct toward a teacher, and Plaintiff admitted that she knows nothing about Kramer's disciplinary record. (R. 67, Pl.'s Resp. to Defs.' Facts ¶¶ 26-27; R. 64-3, Defs.' App., Ex. B, Dep. of Charlene Brown at 18-34.) Plaintiff also points to Anthony Green ("Green"), an African-American student who received only a suspension for sexual harassment, but this actually undercuts Plaintiff's claim that Defendants intentionally treated Devonta more harshly because he is African-American. (*See id.* ¶ 28.) Finally, Plaintiff points to a white student, David Lee ("Lee") as someone who was similarly situated to Devonta; however, Plaintiff has no evidence of what Lee was accused of doing or any details about his disciplinary record. (*Id.* ¶ 30.)

Plaintiff's speculative evidence fails to create a genuine issue of material fact on the critical issue of whether Defendants treated Devonta more harshly than similarly situated students outside his protected class. Accordingly, Defendants' motion for summary judgment on Plaintiff's equal protection claim is granted.

## II. State Law Claims

Plaintiff next claims that Defendants' decision to expel Devonta violated state law because it was an abuse of discretion and against the manifest weight of the evidence. (R. 47, SAC, Counts II-III.) In connection with her state law claims, Plaintiff moves for issuance of a common law *writ of certiorari* to overturn the School Board's expulsion. (*Id.*) "The common law *writ of certiorari* was developed to provide a means whereby a petitioner who was without avenue of appeal or direct review could obtain limited review over action by a court or other

tribunal exercising quasi-judicial functions." *Stratton v. Wenona Comm. Unit Dist. No. 1*, 551 N.E.2d 640, 645 (Ill. 1990). This is the only means of obtaining judicial review of a school disciplinary proceeding on state law grounds.[4] *See id.*; *see also Linwood v. Bd. of Educ. of Peoria*, 463 F.2d 763, 769 (7th Cir. 1972) (interpreting Illinois law). The granting of a common law writ is considered "an extraordinary remedy." *Clements v. Bd. of Educ. of Decatur Pub. Sch. Dist.*, 478 N.E.2d 1209, 1212 (Ill. App. Ct. 1985).

### A. Abuse of Discretion

Plaintiff first claims that the School Board abused its discretion in expelling Devonta. (R. 47, SAC, Count II.) "School discipline is an area which courts enter with great hesitation and reluctance—and rightly so." *Wilson v. Hinsdale Elem. Sch. Dist.*, 810 N.E.2d 637, 642 (Ill. App. Ct. 2004); *see also Clements*, 478 N.E.2d at 1213 (observing that Illinois courts are "extremely reluctant to interject the court's power into the operation of the public schools"). As one Illinois court explained:

> School officials are trained and paid to determine what form of punishment best addresses a particular student's transgression. They are in a far better position than is a black-robed judge to decide what to do with a disobedient child at school. . . . Because of their expertise and their closeness to the situation—and because we do not want them to fear court challenges to their every act—school officials are given wide discretion in their disciplinary actions.

*Wilson*, 810 N.E.2d at 642 (citation omitted).

---

[4] Illinois' Administrative Review Law permits judicial review of state administrative determinations, but applies only where it has been adopted by express reference in the statute creating or conferring jurisdiction on the administrative agency involved. 735 ILCS 5/3-102. The Illinois School Code, the applicable statute here, contains no such express reference and is instead silent with respect to judicial review of student disciplinary determinations. *See* 105 ILCS 5/10-22.6; *see also Stratton*, 551 N.E.3d at 645-46.

11

Under Illinois law, a school district's decision to suspend or expel a student will be reversed only if it is "arbitrary, unreasonable, capricious, or oppressive." *Id.*; *Lusk v. Triad Comm. Unit. No. 2*, 551 N.E.2d 660 (Ill. App. Ct. 1990). To warrant relief, the school board's decision must be more than "merely unreasonable." *Clements*, 478 N.E.2d at 1211. In determining whether the school board has abused its discretion in making a student disciplinary decision, the Court considers the following factors: "(1) the egregiousness of the student's conduct; (2) the history or record of the student's past conduct; (3) the likelihood that such conduct will affect the delivery of educational services to other children; (4) the severity of the punishment; and (5) the interest of the student." *Wilson*, 810 N.E.2d at 643 (citation omitted). The Court considers each factor as it applies in this case.

As for the first factor, the record shows that Devonta touched his teacher's intimate body part in a way that caused her to feel "sexually harassed, disrespected and humiliated." (R. 67, Pl.'s Resp. to Defs.' Facts ¶ 14(e).) The record also indicates that Devonta did the same thing a week earlier. (*Id.* ¶ 14(b).) Devonta did not deny either touching incident, instead stating that he did not recall having touched Moye. (*Id.* ¶ 15(a).) Based on the evidence, the School Board reasonably concluded that Devonta committed a serious infraction.

As to the second factor, this was not Devonta's first disciplinary offense involving conduct of a sexual nature. Less than two months prior to the touching incident, Devonta was suspended for three days when he disrupted his class and used inappropriate language about a female classmate's alleged sexual activities. (*Id.* ¶ 15(b).) Although Devonta tried to ascribe a benevolent motive to his actions, he admitted making the statement and acknowledged that his classmate was upset by it. (*Id.* ¶ 15(c).) Further, as noted above, Moye testified that Devonta

touched her on the buttocks on two separate occasions. Although he was not punished for the first incident, there was evidence before the School Board that Devonta committed a total of three incidents of a sexual nature that had caused distress to other individuals within the school community.

As to the third factor, there was evidence that Devonta's conduct affected the delivery of educational services to other students. Devonta's conduct was directed toward a teacher, who was responsible for teaching many students besides him; his conduct caused her to feel "sexually harassed, disrespected and humiliated," and no doubt caused a disruption to the learning environment in her classroom. (*Id.* ¶ 14(e).) "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *New Jersey v. TLO*, 469 U.S. 325, 350 (1985) (Powell, J., concurring). Moya also had to take time away from her schedule to participate in the investigation and disciplinary proceedings. Devonta's conduct also "took administrators away from their regular duties so that they could perform investigative functions" and participate in his disciplinary proceedings. *Wilson*, 810 N.E.2d at 645.

As to the fourth factor, there is no doubt that Devonta received a harsh punishment, but as stated above, the School Board reasonably concluded that Devonta committed a serious infraction. Moreover, the School Code empowered the School Board to expel Devonta for up to two years, and he received considerably less than this maximum punishment. *See* 105 ILCS 5/10-22.6(d). The fact that the School Board made a "measured decision" about the length of the expulsion, rather than simply imposing the maximum punishment available, supports the conclusion that its decision was not arbitrary, capricious, or unreasonable. *Wilson*, 810 N.E.2d at 646.

13

As to the fifth and final factor, Devonta has an important interest in attending school, but "it is also reasonable to conclude that expulsion from school . . . will impress upon the student the seriousness of his misconduct and the importance of altering his behavior." *Id.* Although Devonta's expulsion has no doubt created difficulties for him and his family, in the long run the expulsion may have a positive effect on Devonta's behavior and his ability to conform that behavior to acceptable standards.[5]

After considering all the relevant factors, this Court cannot conclude that the School Board's decision was arbitrary, capricious, unreasonable, or oppressive.

### B. Weight of the Evidence

Plaintiff next claims that School Board's decision was against the manifest weight of the evidence. (R. 47, SAC, Count III.) In reviewing an agency's decision, a reviewing court may not reweigh evidence, make independent findings of fact, or substitute its own judgment for that of the administrative agency. *Jones v. White*, 816 N.E.2d 1106, 1112 (Ill. App. Ct. 2004). Instead, the function of a reviewing court is to "ascertain whether the final decision of the administrative body is just and reasonable in light of the evidence presented." *Conklin v. Ryan*, 610 N.E.2d 751, 755 (Ill. App. Ct. 1993). "If the record contains any evidence that fairly supports the agency's decision, that decision is not against the manifest weight of the evidence." *Jones*, 816 N.E.2d at 1112. In other words, this Court may not second-guess the School Board's decision "where there is a basis in the record to support its decision." *Stratton*, 551 N.E.2d at 649.

As recounted above, there is ample evidence in the record to support the School Board's decision. At the disciplinary hearing, Moye testified that Devonta had touched her on the

---

[5] Indeed, there is evidence in the record that Devonta is now attending a different school and that his grades have improved. (R. 64-5, Defs.' App., Ex. D, Devonta Dep Tr. at 21-22.)

14

buttocks on two separate occasions. Despite questioning by Devonta's attorney, she would not admit that it was even possible the second touching incident was an accident, or that she was mistaken the incident had occurred.[6] (R. 67, Pl.'s Resp. to Defs.' Facts ¶ 14.) Moye's testimony provided an adequate evidentiary basis for the School Board's decision. *Stratton*, 551 N.E.2d at 649 (principal's testimony furnished sufficient evidentiary basis for School Board's decision to expel student). Moreover, Devonta did not deny that he had touched Moye, but instead testified that he did not recall doing so.[7] (*Id.* ¶ 15.) The School Board reasonably determined that Moye offered the more credible account. Upon review, this Court cannot conclude that the School Board's decision was against the manifest weight of the evidence.

## CONCLUSION

---

[6] Plaintiff attempts to poke holes in Moye's testimony, asserting that she only had a "speculative belief" that Devonta touched her, but Plaintiff is relying on the hearing officer's characterization of Moye's testimony, and not Moye's own words. (*See* R. 69, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 8-10.) Moreover, it is clear from the hearing officer's summary that Moye was quite adamant that Devonta touched her two times, and that the second time was not an accident. (R. 47, SAC, Ex. A; R. 67, Pl.'s Resp. to Defs.' Facts ¶ 14.) There was other evidence before the School Board suggesting that the incident was not an accident, including Moye's written statement, which indicated that a female student informed her that the week prior, Devonta had commented that Moye had a "nice butt" when she bent down to pick up a piece of paper. (*See* R. 47, SAC, Ex. A, Summary of Hearing at 1.) Moye also reported that the manner in which Devonta and his friend kept looking at her after the second touching incident caused her to believe it was not an accident. (*Id.*)

[7] In an effort to prevent summary judgment, Plaintiff submits the affidavit of her attorney, along with a photograph of the attorney holding a tape measure, which purportedly shows that there was 45 inches of space between the computer desk and the wall for Devonta to pass by Moye. (R. 74, Def.'s Resp. to Pl.'s Facts ¶ 53.) Plaintiff argues that this is three inches less than the four feet of space estimated by Moye at the disciplinary hearing; even assuming the evidence has the proper foundation and is accurate, the evidence actually confirms Moye's account that there was ample space for Devonta to pass without touching her. Moreover, as stated above, the question before this Court is solely whether there is evidence to support the School Board's decision. *See Jones*, 816 N.E.2d at 1112; *Stratton*, 551 N.E.2d at 649. The evidence in the record satisfies this standard.

For the foregoing reasons, Defendants' Motion for Summary Judgment (R. 60) is granted.

The Clerk of the Court is directed to enter judgment against Plaintiff and in favor of Defendants.

Entered:

Judge Ruben Castillo
United States District Court

Dated: August 8, 2008